UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERNEST ANDERSON,                          :

                Plaintiff,           :                07 Civ. 7195 (LTS) (AJP)

         -against-                     :                **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of        :
Social Security,
                           :
            Defendant.          :

                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Laura Taylor Swain, United States District Judge:**

        Pro se plaintiff Ernest Anderson brings this action pursuant to § 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of

Social Security (the "Commissioner") denying Anderson supplemental security income ("SSI")

benefits.  (Dkt. No. 2: Complaint.)  The Commissioner has moved for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 8: Notice of Motion; <u>see also</u> Dkt. No. 9: Answer &

Admin. Record; Dkt. No. 7: Comm'r Br.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be GRANTED.

## FACTS

**Procedural Background**

Pro se plaintiff Ernest Anderson applied for SSI benefits on June 10, 2004, alleging that he had a disability since June 18, 2002.  (See Dkt. No. 9: Administrative Record filed by the Commissioner ["R."] at 62-64.)  Anderson claimed he could not work because of HIV infection, memory loss, tiredness, depression, hypertension and high cholesterol.  (R. 35, 75, 79.)  Anderson's application was denied initially (R. 31-34), and Anderson requested a hearing before an Administrative Law Judge ("ALJ") (R. 35).  Initial hearings took place on September 30, 2005, December 12, 2005 and May 1, 2006, but were adjourned to allow Anderson to seek legal representation.  (R. 325-47.)  On December 27, 2006, Anderson waived his right to counsel[1] and testified regarding his condition at an administrative hearing before ALJ Robin J. Arzt.  (R. 348-73.)  On January 10, 2007, the ALJ found that Anderson was not "under a 'disability' as is defined in the Social Security Act at any time since June 10, 2004, the date on which the application was filed."  (R. 10-16 at R. 15.)  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Anderson's request for review on March 10, 2007.  (R. 3-5.)

The issue before the Court is whether the Commissioner's decision that Anderson was not disabled is supported by substantial evidence.  The Court finds that it was.

---

[1]    The ALJ again informed Anderson of available legal services and asked if Anderson "want[ed] to try to get representation or would [he] like to go ahead with the hearing today?" (R. 351.)  Anderson responded that he had "been here so many times that [he] might as well just [go] ahead," and indicated frustration with the "back and forth" he had experienced trying to get representation.  (R. 351-52.)  The ALJ accepted this statement as a waiver of Anderson's right to legal representation.  (R. 352.)

## Hearings Before the ALJ

Anderson was born on November 12, 1948 and completed high school and some college courses.[2] (R. 62, 80, 354-55.)  Anderson's past jobs were primarily in the fashion industry, as a designer or assistant designer of men's clothing.  (R. 76-77, 356, 359.)  Anderson worked at a desk but also did a significant amount of standing and some "running around."  (R. 356-57.)  He was required to lift and carry fabric bundles that could weigh as much as twenty-five to thirty pounds.  (R. 77, 371.)  Anderson's last full-time job designing men's wear was from March 2001 to June 2002 when he was laid off from the company due to downsizing.  (R. 356, 358.)  He worked briefly for a retail store during the 2000 and 2001 holiday seasons, but did not return for a third year because of problems with his feet that made heavy lifting too difficult.  (R. 361-62.)  Anderson last worked in the summer of 2006 for ten days in a freelance design position that paid approximately $3000.  (R. 363.)  Anderson testified that one of the reasons he had trouble acquiring work in the fashion industry was that he lacked the necessary computer skills.  (R. 355-57, 367.)

With regard to physical activity, Anderson testified that he could to take care of his personal needs on his own, including shopping, cooking and cleaning.  (R. 95-98.)  Anderson could stand up to six hours (R. 368-69), sit for a few hours at a time (R. 369-70), and walk anywhere from ten to fifteen city blocks (R. 99, 369).  He sometimes experienced pain in his left foot that made it difficult to walk.  (R. 365.)  Anderson testified that he would be able to lift fifty to sixty pounds on a semi-regular basis, but not repeatedly everyday.  (R. 370.)  He could repeatedly lift up to 20 pounds, which is the most a designer would have to lift.  (R. 371.)  Anderson went outside every

---

[2]    Anderson also stated that he was considering taking some computer classes.  (R. 355.)

day and visited the public library three to four times a week to work on his computer skills.  (R. 98.)
He had no problems traveling alone by bus or train and noted that he walked or swam "everyday."
(R. 97, 354.)

Anderson's Disability Report that he filed in connection with his claim for benefits
(R. 75-81) claimed that his HIV infection, high blood pressure and high cholesterol made him "weak
every now and then," and that he also suffered from insomnia and slept only two hours each night.
(R. 75-76.)  Anderson testified that his energy level varied and that "some days are good, and some
days are bad."  (R. 365.)  Anderson had occasional trouble walking and suffered from night sweats
due to his HIV medications.  (R. 364.)  He testified that, at the time of his hearing, he was not
experiencing any skin conditions and had never had oral thrush.[3/]  (R. 365.)  Anderson testified that
he had never been admitted to a hospital or sought emergency treatment because of his condition,
and that his physician told him his viral load was "quite good."  (R. 364-65.)  In addition to HIV
medication, Anderson indicated that he took medication for hypertension.  (R. 366.)  He sometimes
experienced memory loss from the medications he was taking.  (R. 371.)

**Medical Evidence Before the ALJ**

The medical evidence before the ALJ consisted of records from Anderson's treating
physicians from October 1995 through January 2005 (R. 117-321), as well as a June 2004 Diagnostic
Health Services ("DHS") report (R. 110-11).[4/]

---

[3/]     His medical records, however, indicate at least one occurrence of oral thrush in November
1996.  (R. 144.)

[4/]     At Anderson's May 1, 2005 hearing, he indicated that he recently had been under the care of
(continued...)

5

### Treating Physician's Records

Anderson's medical records first indicate possible positive HIV status in late 1995 - early 1996.[5/] (R. 134-40, 269.)  After an evaluation by RN Donald Gardenier at Betances Health Center in New York City, RN Gardenier ordered a blood test because of HIV suspicion; Anderson was tested on February 9, 1996 and informed of the positive results of the test on February 23, 1996. (R. 138, 263.)  Anderson continued routine check-ups at Betances for the next ten years.  (See generally R. 134-321.)

On February 5, 1996, RN Gardenier noted that Anderson had "[n]o additional Herpes Zoster outbreaks," indicating that he had them previously.  (R. 136.)  Anderson denied zoster outbreaks in March 1996 (R. 139), and though he complained of pain at the zoster site in September 1996 (R. 142), the infection was not mentioned again.

On March 5, 1996, Anderson complained of a sore throat.  (R. 139.)  At an appointment on July 22, 1996, RN Gardenier noted that Anderson "continues to refuse anti-[retro]viral medication." (R. 140.) On September 3, 1996, RN Gardenier diagnosed Anderson with genital warts and removed them a few days later.  (R. 140, 142.)  On November 8, 1996, Anderson

---

[4/]    (...continued)
Dr. Do at Beth Israel Medical Center for "problems with [his] heart." (R. 328.) The ALJ told Anderson that his Beth Israel records would be requested. (R. 330.) There is nothing from Beth Israel in the Administrative Record, but Anderson did testify at the December 27, 2006 hearing that Beth Israel doctors told him that "everything was fine for the moment," although he would likely have to take Toprol to regulate his blood pressure for the rest of his life. (R. 367.)

[5/]    On October 25, 1995, RN Gardenier noted that there were "sores developing in [left] thoracic area," and Anderson's CD4 count was 140, well below the then reference range of 359-1319. (R. 134, 269.)

was diagnosed with oral thrush on his tongue. (R. 144.) The oral thrush was not noted at his next appointment in January 1997 (R. 145), and RN Gardenier encouraged him again to consider anti-retroviral medication. (R. 146.) Genital warts continued to bother Anderson and were noted on several occasions. (R. 148-49.) Anderson was diagnosed with genital herpes in September 1996 but this cleared up by November 1996 after his doctor prescribed Zovirax. (R. 142-44.) Herpes outbreaks bothered Anderson on a few other occasions. (See R. 151, 152, 154). Anderson also suffered occasionally from facial warts. (R. 146, 151.) Anderson's warts either resolved themselves or were removed by doctors successfully each time. (R. 142, 145, 148-49.)

On March 19, 1998, Anderson told RN Gardenier, for the first time, that he was willing to begin anti-retrovirals. (R. 154.) The first indication, however, that Anderson took HIV medication was on February 26, 1999, when Dr. Guillermo Santo of Betances noted that Anderson had started Sustiva. (R. 158.) By June 1999 Anderson had also begun Zerit and Epivir. (R. 161.) At a June 9, 1999 examination, Anderson complained of a dark spot on his scalp that was not noted again. (R. 161). In April 2000 Anderson was diagnosed with eczema. (R. 165-66.) On November 6, 2000, Anderson complained of a sore right arm, but two weeks later reported that his arm felt "much better." (R. 170.) On November 30, 2000, Anderson was advised of acupuncture immunotherapy at Betances (R. 171) but did not start the treatment until 2003 (see R. 184-86, 190-91). On June 19, 2001, Dr. Santo noted lipoatrophy on Anderson's face.[6] (R. 174.)

_____

[6]     Lipoatrophy is atrophy (i.e., wasting away) of subcutaneous fat. Dorland's Illustrated Medical Dictionary 170, 1015 (29th ed. 2000).

On May 14, 2003, Anderson complained of a rash on his right foot that had been present for two months (R.188), and still suffered from it when he returned to Betances on July 28, 2003 (R.192). Lipoatrophy also was noted. (R. 193.) Nevertheless, on June 9, 2003, Anderson had reported to his doctor that he "feels better overall" and had no major complaints. (R. 186.) Anderson was treated for a sore throat and acute pharyngitis on August 28, 2003. (R. 194-95.) His lipoatrophy again was noted on September 8, 2003 (R. 196-97), October 8, 2003 (R. 198), February 25, 2004 where it was described as "mild" (R. 200) and April 1, 2004 (R. 202). On October 8, 2003, Anderson complained of rectal bleeding caused by two perianal lesions. (R. 198-99.) He was also given Crestor for high cholesterol. (R. 199.) Anderson's anal pain had improved by February 25, 2004, and the record does not indicate lesions (R. 200), although blisters from lesions were noted on April 1, 2004 (R. 203). On May 27, 2004, Anderson complained of a chest rash and was diagnosed with syphilis (R. 204-05), which Dr. Photangtham treated with penicillin injections (R. 203-09). The rash was "resolved" by June 9, 2004. (R. 208.) On July 8, 2004, an electrocardiogram revealed an occasional premature ventricular contraction. (R. 211.)

Doctors diagnosed Anderson's hypertension in May 2004, and Dr. Photangtham prescribed Hyzaar. (R. 205.) Doctor Photangtham also noted hypertension in June 2004 (R. 207), July 2004 (R. 211), September 2004 (R. 122) and December 2004 (R. 124). Anderson's blood pressure fluctuated during this time period between normal and high. (R. 204, 206, 210, 121, 123.)

On September 15, 2004, Anderson complained of depression and memory lapses, although Dr. Photangtham wrote a question mark down next to the words "memory lapses" in

8

Anderson's chart. (R. 121.) Dr. Photangtham noted Anderson's lipoatrophy. (R. 121.) Anderson's December 30, 2004 appointment revealed no new information. (R. 123-24.)

Regarding Anderson's HIV infection, "[t]esting throughout the period under review showed that [his] CD4 count was in, or somewhat below the reference range."[7] (Dkt. No. 7: Comm'r Br. at 6; see R. 291 (CD4 count 337 in March 2002); R. 298 (CD4 count 389 in January 2003); R. 300 (CD4 count 403 in May 2003); R. 301 (CD4 count 427 in October 2003); R. 308 (CD4 count 429 in February 2004); R. 314, 317 (CD4 count 491 in May 2004); R. 125 (CD4 count 387 in September 2004); R. 131 (CD4 count 546 in January 2005).) Tests also showed that Anderson's HIV-1 RNA viral load was within the reference range.[8] (E.g., R. 126, 132, 289, 293, 295, 299, 302, 309, 311, 318, 319.)

**Consulting Physician Reports**

Dr. A. Cacciarelli of Diagnostic Health Services examined Anderson on July 15, 2004. (R. 110-11.) Anderson reported that "[h]e does his own shopping, cooking and cleaning." (R.110.) Anderson indicated that he took several medications, including Sustiva, Viread and Epivir for his HIV infection. (R. 110.) Anderson complained of occasional headaches, dizziness and blurry

---

[7] The CD4 count is a predictor of the onset of serious opportunistic infections associated with AIDS. See The Merck Manual of Diagnosis & Therapy 1628-29 (18th ed. 2006). Generally, an individual's vulnerability to opportunistic infections increases markedly when the CD4 count falls below 200. Id. at 1629; see also 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00(D)(3)(a)(iii).

[8] Viral load testing reveals the number of HIV-1 retroviruses present in the plasma, and is a useful predictor of the future clinical course of and measure of responses to anti-retroviral therapy. The Merck Manual of Diagnosis & Therapy 1634.

vision that prevented him from returning to work. (R. 110.) Anderson denied any psychiatric history, smoking, drinking or drug use. (R.110.) Anderson's blood pressure was 110/70. (R. 110.) Dr. Cacciarelli reported the following about Anderson's musculoskeletal system: "[S]tation and gait normal. No difficulty transferring from a seated position on and off the examining table. Full use of both hands and arms in dressing and undressing. Finger/hand dexterity intact. Spine/joints with full range of motion without deformities, swelling, warmth or tenderness. No atrophy. No spasm." (R. 111.) Dr. Cacciarelli further noted that Anderson was "[a]lert and oriented" and had normal motor and cerebral functions. (R. 111.) Dr. Cacciarelli diagnosed Anderson as having HIV, hypertension and hypercholesterolemia. (R. 111.) As to Anderson's "[f]unctional capacity to do work-related activities," Dr. Cacciarelli opined that Anderson "would have a limited ability to push, pull or carry heavy objects or stand for long periods of time." (R. 111.)

Dr. L. Maynard completed a "Physical Residual Functional Capacity Assessment" of Anderson based on his HIV and hypertension. (R.112-16.) Dr. Maynard concluded that Anderson could "occasionally lift or carry [up to] twenty pounds and frequently lift or carry up to ten pounds; sit, stand or walk six hours in an eight hour day; and was unlimited as to push and pull activities." (R. 113.) Dr. Maynard found no manipulative, communicative, visual, or environmental limitations and noted only slight postural limitations. (R. 113-15.) Although Anderson displayed "mild temporal wasting with some mild diffuse lymphadenopathy,"[9] the rest of his evaluation was within

---

[9]    Lymphadenopathy is the term for swollen lymph nodes. <u>Dorland's Illustrated Medical Dictionary</u> 1034; <u>The American Medical Association Encyclopedia of Medicine</u> 654 (1989).

10

normal limits.  (R. 113.)  Based upon the interview and review of Anderson's medical records,

Dr. Maynard concluded that Anderson was capable of light residual functional capacity.  (R. 113.)

**The ALJ's Decision**

On January 10, 2007, the ALJ denied Anderson's application for SSI benefits in a

written decision.  (R. 8-16.)

The ALJ reviewed Anderson's hearing testimony and noted that Anderson was HIV

positive, suffered from foot pain in damp weather,[10] and had asymptomatic hypertension controlled

with the medication Toprol.  (R. 14.)  The ALJ also noted that Anderson was evaluated and tested

negative for a heart condition.  (R. 14.)  Anderson takes anti-retroviral medications that Anderson

believes cause memory loss.  (R. 14.)  The ALJ found that despite Anderson's HIV infection, "[h]e

has not had any opportunistic infections, including oral thrush" and that "[h]is viral load has been

undetectable and his [CD4] cell count has been in the 400s and as low as 350 in recent years."  (R.

14.)  The ALJ noted that Anderson testified that he did not get fevers but did suffer from night

sweats and had trouble sleeping.  (R. 14.)  Anderson occasionally suffered from skin rashes, and his

energy level varied from day to day, leaving him short of breath when he walks.  (R. 14.)

The ALJ noted Anderson's testimony about his past relevant work as a fashion

designer included ten years in Europe and that since returning to the United States "[h]e has done

intermittent freelance work as a fashion designer."  (R. 14.)  These jobs lasted anywhere from two

to three months, although Anderson did work full time for Geoffrey Beene from March 2001 to June

2002.  (R. 14.)  Referring to Anderson's testimony, the ALJ noted that design work entails "some

---

[10]    The ALJ noted that Anderson did not mention foot pain during the hearing.  (R. 14.)

11

travel, some desk work, standing and walking about six hours out of an eight hour work day, and lifting small rolls of material that weigh 10 to 20 pounds." (R. 14.) The ALJ found that Anderson indicated an ability to "stand and walk for six hours out of an eight hour work day, walk for 10 to 15 blocks at a time, sit for six hours out of an eight hour work day and up to two hours at a time, . . . and repeatedly lift and carry up to 20 pounds at a time." (R. 14.) The ALJ noted Anderson's admission that "his lack of computer skills is the barrier to doing his work as a fashion designer." (R. 14.)

The ALJ reviewed the opinion of the consulting physician from Anderson's July 2004 examination. (R. 15.) The consulting physician diagnosed HIV infection and hypertension and stated that Anderson "would have a limited ability to push, pull or carry heavy objects or stand for long periods of time." (R. 15.) The ALJ found that Anderson's testimony regarding his abilities "negates the consultant's conclusion that [Anderson] is not able to stand for long periods." (R. 15.)

The ALJ also reviewed Anderson's "extensive" medical records from Betances. (R. 15.) Anderson was "fully compliant with his course of [HIV] treatments." (R. 15.) Anderson's "clinical records show[ed] that his viral load ha[d] been undetectable and his [CD4] cell count was mildly depressed at 387 in September 2004 but improved to the normal range by late 2004 and early 2005." (R. 15.) The ALJ noted that Anderson's other bloodwork came back normal and that despite lipoatrophy, perianal blisters, and successfully treated syphilis, Anderson's HIV infection was "relatively mildly symptomatic." (R. 15.)

The ALJ concluded that Anderson's "medically determinable impairments reasonably could be expected to produce the symptoms and limitations stated by [Anderson], but that

[Anderson's] statements concerning the intensity, persistence and limiting effects of these symptoms support a finding that [Anderson] is not disabled, since [he] described an ability to do his past relevant work as a fashion designer." (R. 14-15.)

After reviewing this evidence, the ALJ performed the appropriate five step legal analysis, as follows: At the first step, the ALJ found that Anderson "ha[d] not engaged in substantial gainful activity since June 10, 2004, the alleged disability onset date." (R. 13.) At the second step, the ALJ found that Anderson "has the following severe combination of impairments: an HIV infection and intermittently controlled hypertension." (R. 13.) At the third step, the ALJ found that while Anderson had severe impairments, he did not have an "impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 13.) At the fourth step, the ALJ found that Anderson retained the residual functional capacity to perform "light work" (as well as sedentary work), including the ability to "stand and walk for six hours out of an eight hour work day, walk for 10 to 15 blocks at a time, sit for six hours out of an eight hour work day and up to two hours at a time, . . . and lift and carry up to 20 pounds at a time occasionally and up to ten pounds at a time frequently." (R. 13-14.) The ALJ found that Anderson could perform his past relevant work as a fashion designer, which she characterized as "skilled, exertionally light work." (R. 15.) The ALJ concluded that Anderson was not "under a 'disability' as is defined in the Social Security Act at any time since June 10, 2004, the date on which the application was filed." (R. 15.)

<u>ANALYSIS</u>

I.    <u>THE APPLICABLE LAW</u>

A.    <u>Definition of Disability</u>

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 Fed. Appx. 25, 26 (2d Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 Fed. Appx. 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 Fed. Appx. 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 Fed. Appx. 940, 941 (2d Cir. 2005); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005).[11]

An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

---

[11]    <u>See also</u>, <u>e.g.</u>, <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Martinez</u> v. <u>Massanari</u>, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); <u>Garcia</u> v. <u>Barnhart</u>, 01 Civ. 8300, 2003 WL 68040 at *4 (S.D.N.Y. Jan. 7, 2003); <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002); <u>Worthy</u> v. <u>Barnhart</u>, 01 Civ. 7907, 2002 WL 31873463 at *4 (S.D.N.Y. Dec. 23, 2002); <u>Perez</u> v. <u>Barnhart</u>, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002).

14

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)(B), 1382c(a)(3)(B)(G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[12/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;  (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[13/]

---

[12/]  See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79; Garcia v. Barnhart, 2003 WL 68040 at *4; Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

[13/]  See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); Rivas v. Barnhart, 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005); Batista v. Comm'r of Soc. Sec., 03 Civ. 10121, 2004 WL 2700104 at *7 (S.D.N.Y. Nov. 23, 2004); Rebull v. Massanari, 240 F. Supp. 2d at 268; Worthy v. Barnhart, 2002 WL 31873463 at *4.

15

### B.    <u>Standard of Review</u>

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  <u>E.g.</u>, <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u> 362 F.3d 28, 31 (2d Cir. 2004), <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 105-06 (2d Cir. 2003); 42 U.S.C. § 405(g).[14]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[15]

---

[14]    See also, <u>e.g.</u>, <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Vapne</u> v. <u>Apfel</u>, 36 Fed. Appx. 670, 672 (2d Cir.), <u>cert. denied</u>, 537 U.S. 961, 123 S. Ct. 394 (2002); <u>Horowitz</u> v. <u>Barnhart</u>, 29 Fed. Appx. 749, 752 (2d Cir. 2002); <u>Machadio</u> v. <u>Apfel</u>, 276 F.3d 103, 108 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983); <u>Rodriguez</u> v. <u>Barnhart</u>, 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), <u>aff'd</u>, 163 Fed. Appx. 15 (2d Cir. 2005); <u>Martinez</u> v. <u>Massanari</u>, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); <u>Duran</u> v. <u>Barnhart</u>, 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003); <u>Garcia</u> v. <u>Barnhart</u>, 01 Civ. 8300, 2003 WL 68040 at *3 (S.D.N.Y. Jan. 7, 2003); <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268-69 (S.D.N.Y. 2002); <u>Worthy</u> v. <u>Barnhart</u>, 01 Civ. 7907, 2002 WL 31873463 at *3 (S.D.N.Y. Dec. 23, 2002); <u>Norris</u> v. <u>Barnhart</u>, 01 Civ. 0902, 2002 WL 31778794 at *3 (S.D.N.Y. Dec. 12, 2002); <u>Morales</u> v. <u>Barnhart</u>, 01 Civ. 4057, 2002 WL 31729526 at *6 (S.D.N.Y. Dec. 5, 2002).

[15]    See also, <u>e.g.</u>, <u>Duran</u> v. <u>Barnhart</u>, 2003 WL 103003 at *9; <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[16/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[17/]  However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[16/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46; Batitsta v. Comm'r of Soc. Sec., 03 Civ. 10121, 2004 WL 2700104 at *5 (S.D.N.Y. Nov. 23, 2004); Rodriguez v. Barnhart, 2004 WL 1970141 at *9; Martinez v. Massanari, 242 F. Supp. 2d at 375; Duran v. Barnhart, 2003 WL 103003 at *9; Garcia v. Barnhart, 2003 WL 68040 at *3; Worthy v. Barnhart, 2002 WL 31873463 at *3; Norris v. Barnhart, 2002 WL 31778794 at *3; Morales v. Barnhart, 2002 WL 31729526 at *6; Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

[17/]    See also, e.g., Colling v. Barnhart, No. 06-2513, 2007 WL 4102734 at *1 (2d Cir. Nov. 19, 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996); Rodriguez v. Barnhart, 2004 WL 1970141 at *9; Garcia v. Barnhart, 2003 WL 68040 at *3; Morales v. Barnhart, 2002 WL 31729526 at *6.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[18/] accord, e.g., Williams

---

[18/]    Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2. The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will
(continued...)

18

v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec.,

206 Fed. Appx. at 26; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[19]

        The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

can perform considering not only his medical capacity but also his age, education and training. See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[20]

---

[18]    (...continued)
assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. See 68 Fed. Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (See pages 10-12 above.)

[19]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Batitsta v. Comm'r of Soc. Sec., 2004 WL 2700104 at *6; Rodriguez v. Barnhart, 2004 WL 1970141 at *9-10; Martinez v. Massanari, 242 F. Supp. 2d at 375-76; Garcia v. Barnhart, 2003 WL 68040 at *4; Worthy v. Barnhart, 2002 WL 31873463 at *4; Norris v. Barnhart, 2002 WL 31778794 at *3-4; Perez v. Barnhart, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002); Soto v. Barnhart, 2002 WL 31729500 at *4-5.

[20]    See also, e.g., Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. at 643; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Curry v. Apfel, 209 F.3d at 122; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Rodriguez v. Barnhart, 2004 WL 1970141 at *10.

19

C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Colling v. Barnhart, No. 06-2513, 2007 WL 4102734 at *1 (2d Cir. Nov. 19, 2007); Lamorey v. Barnhart, 158 Fed. Appx. 361, 362 (2d Cir. 2006).[21]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

---

[21]    See also, e.g., Foxman v. Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 Fed. Appx. 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 Fed. Appx. 306, 308 (2d Cir 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); Martinez v. Massanari, 242 F. Supp. 2d 372, 376 (S.D.N.Y. 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *5 & n.4-5 (S.D.N.Y. Jan. 7, 2003).

20

physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); see, e.g., Foxman v. Barnhart, 157 Fed. Appx. at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[22]

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II.    THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE, BECAUSE ANDERSON'S COMPLAINT IS CONCLUSORY AND HE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION[23]

---

[22]    See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Martinez v. Massanari, 242 F. Supp. 2d at 376; Garcia v. Barnhart, 2003 WL 68040 at *6; Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

[23]    For additional decisions by this Judge discussing the grant of judgment on the pleadings to the Government in Social Security cases where the plaintiff has filed no opposing papers (or only conclusory papers) in language substantially similar to that in this entire section of this Report and Recommendation, see, e.g., Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *10-11 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); Feliciano v. Barnhart, 04 Civ. 9554, 2005 WL 1693835 at *9-10 (S.D.N.Y. July 21, 2005) (Peck, M.J.); Morgan v. Barnhart, 04 Civ. 6024, 2005 WL 925594 at *9-10 (S.D.N.Y. Apr. 21, 2005) (Peck, M.J.), report & rec. adopted, 2007 WL 2609897 (S.D.N.Y. Sept. 5, 2007); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *8-9 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *9 (S.D.N.Y. July 8, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *6-8 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Morel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at *7
(continued...)

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability.  See, e.g., Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("The claimant generally bears the burden of proving that she is disabled under the statute. . ."); Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981) ("It is well established that the burden of proving disability is on the claimant."); Dousewicz v. Harris, 646 F.2d 771, 772 (2d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established . . . , namely, 'the burden of sustaining the claim for benefits is on the claimant' and 'The findings of the Social Security Agency are final and binding if there is a substantial basis for them.'").[24]

Here, Anderson's pro se complaint states only that he should receive Social Security SSI benefits because of "HIV."  (Dkt. No. 2: Compl. ¶ 4.)  Anderson has not filed any brief or

---

[23] (...continued)
(S.D.N.Y. July 11, 2001) (Peck, M.J.); Casiano v. Apfel, 39 F. Supp. 2d 326, 327-28 (S.D.N.Y. 1999) (Stein, D.J. & Peck, M.J.), aff'd mem., No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000).

[24] See also, e.g., Pena v. Barnhart, 01 Civ 502, 2002 WL 31487903 at *8 (S.D.N.Y. Oct. 29, 2002); Reyes v. Barnhart, 01 Civ 1724, 2002 WL 31385825 at *5 (S.D.N.Y. Oct. 21, 2002); Ortiz v. Shalala, 93 Civ. 3561, 1994 WL 673630 at *1 (S.D.N.Y. Dec. 1, 1994); Morton v. Heckler, 586 F. Supp. 110, 111 (W.D.N.Y. 1984); Harvey L. McCormick, Soc. Sec. Claims & Proc. § 14:16 (5th ed. 1998) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention.  The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure. . . . ").

affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed.  (<u>See</u> Dkt. No. 4: 9/17/07 Scheduling Order; <u>see also</u> Dkt. No. 6: 11/7/07 Memo Endorsed Order.) Thus, Anderson does not point to any specific testimony or evidence which he believes the ALJ overlooked or unjustly weighed.  Anderson's complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. <u>See</u> cases cited in fn.23 above; <u>see also</u>, <u>e.g.</u>, <u>Loper</u> v. <u>Barnhart</u>, No. 05-CV-6563, 2006 WL 1455480 at *2 (W.D.N.Y. May 9, 2006) (citing my <u>Alvarez</u> decision); <u>Winegard</u> v. <u>Barnhart</u>, No. 02-CV-6231, 2006 WL 1455479 at *9-10 (W.D.N.Y. Apr. 5, 2006) (same);<u>Reyes</u> v. <u>Barnhart</u>, 01 Civ. 4059, 2004 WL 439495 at *3 (S.D.N.Y. Mar. 9, 2004) (following my decisions in <u>Jiang</u>, <u>Alvarez</u> and <u>Morel</u>); <u>Counterman</u> v. <u>Chater</u>, 923 F. Supp. 408, 414 (W.D.N.Y. 1996) (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory.  She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); <u>Steiner</u> v. <u>Dowling</u>, 914 F. Supp. 25, 28 n.1 (N.D.N.Y. 1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs – providing only a single conclusory paragraph in their Statement of Undisputed Facts . . . , and in their Attorney's Affirmation. . . ."), <u>aff'd</u>, 76 F.3d 498 (2d Cir. 1996); <u>see generally</u> S.D.N.Y. Local Civil Rule 7.1 ("all motions and all oppositions thereto shall be supported by a memorandum of law,

setting forth the points and authorities relied upon in support of or in opposition to the motion . . . .

Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion

or for the granting of a motion by default.").

## III.    APPLICATION OF THE FIVE STEP SEQUENCE TO ANDERSON'S CLAIMS

_____For the reasons set forth in Point II above, the Court need not apply the five-step

sequence to Anderson's claims.  Even if the Court were to do so, however, the Commissioner's

decision that Anderson was not disabled should be affirmed since it is supported by substantial

evidence.

### A.    Anderson Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Anderson was engaged in substantial gainful activity after

his application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing

significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."

20 C.F.R. § 404.1510.  The ALJ's conclusion that Anderson was not engaged in substantial activity

during the applicable time period (R. 13) is not disputed.  (See Dkt. No. 7: Comm'r Br. at 10.)

### B.    Anderson Demonstrated Severe Physical Impairments That Significantly Limited His Ability To Do Basic Work Activities

The next step of the analysis is to determine whether Anderson proved that he had

a severe impairment or combination of impairments that "significantly limit[ed his] physical or

mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R.

§ 404.1521(b).  "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(C)).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

The ALJ determined that the medical evidence indicated that Anderson's HIV infection and "intermittently controlled hypertension" were impairments that were severe within the meaning of the Regulations.  (R. 13.)  These findings are not disputed (see Dkt. No. 7: Comm'r Br. at 10), and the Court therefore proceeds to the third step of the five part analysis.

**C.**    **Anderson Did Not Have A Disability Listed in Appendix 1 of the Regulations**

The third step of the five-part test requires a determination of whether Anderson had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

The ALJ found that while Anderson's medical conditions were "severe," Anderson "does not have an impairment . . . that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 13.) Appendix 1 provides a categorization of physical impairments, including HIV/AIDS and hypertension. <u>See</u> 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§4.00(H)(1) & (7), 14.08.

**1.**    **Anderson's HIV Does Not Satisfy Appendix 1**

The regulations provide that "[a]ny individual with HIV infection, including one with a diagnosis of acquired immunodeficiency syndrome (AIDS), may be found disabled under this listing if his or her impairment meets any of the criteria in 14.08 or is of equivalent severity to any impairment in 14.08." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(D)(1).

The medical evidence in the record demonstrates that Anderson's HIV-related symptoms did not rise to the level of severity necessary to qualify as a disability. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08; <u>see</u>, <u>e.g.</u>, <u>Castro</u> v. <u>Apfel</u>, No. 99-6009, 189 F.3d 460 (table),1999 WL

568022 at *1 (2d Cir. July 30, 1999) ("Social Security benefits are not available for a positive HIV status unless it is accompanied by one of various related disorders listed under 20 C.F.R. pt. 404, subpt. P, app.1, § 14.08(A)-(N)."); Pratts v. Chater, 94 F.3d 34, 37-39 (2d Cir. 1996) (When HIV is claimed as a disability, analysis of the same five factors is required as all social security cases.); Cruz v. Astrue, No. 07-CV-4658, 2008 WL 597194 at *8 (E.D.N.Y. Mar. 2, 2008) ("Section 14.08 of the Listing of Impairments specifies that HIV qualifies only if it is accompanied by one of several aggravating factors such as opportunistic infections or significant involuntary weight loss."); Acevedo v. Barnhart, 05 Civ. 8117, 2007 WL 1982753 at *5 (S.D.N.Y. July 3, 2007) (HIV positive plaintiff not disabled where there were "no major opportunistic infections."); Roman v. Barnhart, 477 F. Supp. 2d 587, 598 (S.D.N.Y. 2007) (Plaintiff not disabled due to HIV infection where accompanying impairments were "isolated incidents" rather than "chronic" ailments.); Spain v. Barnhart, 04 Civ. 2859, 2005 WL 1423358 at *7 (S.D.N.Y. June 16, 2005) ("HIV infection is not a listed impairment unless accompanied by symptoms or conditions listed in" § 14.08.); Beckwithe v. Barnhart, 371 F. Supp. 2d 195, 200-01 (E.D.N.Y. 2005) (HIV positive plaintiff not disabled because she could not show the impairments listed in Section 14.08 of Appendix 1.); Quiles v. Barnhart, 338 F. Supp. 2d 363, 373 (D. Conn. 2004) (Plaintiff not disabled where her HIV is "relatively stable with treatment," despite claims of trouble sleeping and memory difficulties.); Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *4 (S.D.N.Y. Mar. 9, 2004) (Swain, D.J.); Worthy v. Barnhart, 01 Civ. 7907, 2002 WL 31873463 at *5 (S.D.N.Y. Dec. 23, 2002), Alvarez v. Barnhart, 02 Civ. 3121, 2002 WL 31663570 at *10 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.); Perez v. Apfel, 99

Civ. 2183, 2000 WL 124818 at *3 (S.D.N.Y. Feb. 1, 2000) (At step 3, plaintiff's HIV status did not meet or equal an impairment described in the listings.)

Anderson's syphilis infection does not satisfy the Appendix 1 requirement for HIV infection. Section 14.08 provides that a syphilis or neurosyphilis infection that accompanies HIV infection will automatically qualify a person as disabled if the effects on another body system (such as a person's vision, cardiovascular or neurological system) are severe enough. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(A)(4). Anderson's records show only one syphilis diagnosis (by Dr. Photangtham) in May 2004. (See page 7 above.) Anderson was given antibiotics to treat the infection. (See page 7 above.) There is no indication in the medical records that Anderson's syphilis had any effect on another body system. Substantial evidence supports the ALJ's determination that Anderson's syphilis did not equal the impairments listed in § 14.08(A).

Anderson's herpes infections do not satisfy the Appendix 1 requirements for HIV infection. In order to qualify as a disability, outbreaks of herpes simplex must cause "mucocutaneous infection (e.g., oral, genital, perianal) lasting for 1 month or longer." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(D)(2). Herpes zoster must be "either disseminated or with multidermatomal eruptions that are resistant to treatment." Id. § 14.08(D)(3). Anderson suffered from both herpes simplex and herpes zoster. (See pages 5-6 above.) Anderson's herpes zoster outbreak only was noted in February 1996, at which point it was characterized as controlled. (See page 5 above.) In March 1996, Anderson denied any zoster recurrence, and although he indicated in September 1996 that he felt pain at the zoster site, Anderson never complained of, or was diagnosed with, herpes

zoster outbreaks again.  (See page 6 above.)  Anderson's herpes simplex outbreaks were similarly

sparse.  Anderson first complained of herpes simplex outbreaks on September 6, 1996, but later

reported that it had improved after using Zovirax.  (See page 6 above.)  His next outbreak was noted

on September 26, 1997 (R. 151) and again on November 11, 1997 (R. 152) and March 19, 1998 (R.

154).  Although this outbreak lasted longer than one month, it did not occur during Anderson's

claimed period of disability, i.e., after June 10, 2004.  No herpes outbreak occurred after Anderson's

claimed disability date.

Anderson's records also indicate multiple outbreaks of genital and facial warts.  (R.

140, 144, 145, 148.)  In order for warts or other skin conditions to qualify as an Appendix 1 HIV-

related impairment, they must have "extensive fungating or ulcerating lesions not responding to

treatment."  20 C.F.R., Pt. 404, Subpt. P, App. 1, §14.08(F).  Anderson's warts were never

unresponsive; doctors successfully removed the warts following each outbreak with no adverse side

effects.  (See page 6 above.)

Anderson's HIV – as manifested in general symptoms – does not satisfy the Appendix

1 requirement.  Section 14.08(N) indicates that an individual with HIV will qualify for disability

benefits when he can show:

> [r]epeated (as defined in 14.00D8) manifestations of HIV infection (including those listed
> in 14.08 A-M, but not meeting the requisite findings, . . . ) resulting in significant,
> documented symptoms or signs (e.g., fatigue, fever, malaise, weight loss, pain, night sweats)
> and one of the following at the marked level (as defined in 14.00D8):
> 1. Restriction of activities of daily living; or
> 2. Difficulties in maintaining social functioning; or
> 3. Difficulties in completing tasks in a timely manner due to deficiencies in concentration,
> persistence or pace.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(N).

Anderson did not suffer from any significant weight loss during the claimed disability period and actually gained weight since his initial HIV diagnosis.[25] Anderson never complained of fever but he did complain of nightsweats during his hearing testimony. (See page 4 above.) Moreover, Anderson's symptoms fail to qualify his HIV as a disability under §14.08(N) because there is no evidence that they affect his daily activities or his ability to complete tasks in a timely manner, and there is only scant evidence that his social life was affected.[26] (See R. 98.) Anderson indicated that he cooks, cleans, and shops for himself, tries to go swimming or walking every day, and that he goes to the library to work on his computer skills several times per week, and generally finishes chores that he starts.[27] (See pages 3-4 above.) Anderson did note that some tasks take him longer to complete and that "some days are good, some days are bad." (R. 365-68.) There is, however, no evidence of a "marked level" of restriction. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 14.08(N).

---

[25] Anderson weighed 177 pounds in October 1995 and 188 pounds in December 2004. (R. 134, R. 123; see also R. 134-211 (Anderson's weight never rose above 195 lbs. or below 175 lbs., and never changed more than 11 lbs. between check-ups).)

[26] In Anderson's New York State disability report Anderson noted that he sees friends less and cannot stay up late or be as active socially, although on the prior page he indicated no changes in his hobby or interest activities as a result of his illness. (R. 97-98.)

[27] In Anderson's New York State disability report he indicated he finishes what he starts, for example chores. (R. 99.) However, on the very next page he indicated that "during the day [he] starts some things and [then doesn't] remember what he was doing." (R. 100.)

Given the medical evidence and Anderson's hearing testimony, substantial evidence supports the ALJ's conclusion that Anderson's HIV infection was not disabling because it was not accompanied by any of the impairments listed under section 14.08 of the Appendix.

### 2.   Anderson Does Not Have Hypertension as Described in Appendix 1[28]

The evaluation of hypertension is explained in a section titled "Evaluating Other Cardiovascular Impairments" in the Listing of Impairments:

> Because <u>hypertension</u> (high blood pressure) generally causes disability through its effects on other body systems, we will evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under the listings. We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).

The ALJ found that Anderson's diagnosis of "intermittently controlled hypertension" constituted a severe impairment but did not find that it met the requirements of Appendix 1.[29]  (See page 12 above.)

Anderson's blood pressure readings fluctuated and were sometimes high, but there is no evidence that this produced any effects (primary or secondary) that severely impaired other

---

[28]  In addition to hypertension, Anderson claimed disability based on high cholesterol.  (<u>See</u> page 2 above.)  High cholesterol may be severe enough to qualify as an Appendix 1 impairment.  <u>See</u> 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(7).  Anderson, however, alleged no specific limitation or defect resulting from his high cholesterol.  Anderson controls his cholesterol with Crestor.  (<u>E.g.</u>, R. 199.)  Furthermore, doctors at Beth Israel Hospital told Anderson that his heart and cardiovascular system were "fine" for the moment.  (<u>See</u> fn.4 above.)

[29]  The ALJ did not elaborate on why Anderson's hypertension did not fall within the listings, noting only that "[l]isting 14.08 was considered" in her step-three analysis.  (R. 13.)

bodily systems.[30/]  The ALJ, therefore, correctly concluded that Anderson's hypertension was not disabling.  See, e.g., Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Nunez v. Barnhart, 05 Civ. 9221, 2007 WL 313459 at *6-7 (S.D.N.Y. Feb. 1, 2007) (hypertension was asymptomatic, controlled by medication, and did not affect plaintiff's ability to perform basic work activities); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *15 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.) (plaintiff's hypertension not disabling where it was under control due to medication), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); Lowe v. Barnhart, 04 Civ. 9012, 2006 WL 1911020 at *7-8 (S.D.N.Y. July 10, 2006) (plaintiff's hypertension not a severe impairment where controlled through medication and plaintiff could perform a variety of daily activities); Tillackdharry v. Barnhart, 05 Civ. 6639, 2006 WL 903191 at *5 (S.D.N.Y. Apr. 10, 2006) (plaintiff's hypertension not disabling where controlled by medication and he had the residual functional capacity to perform a significant range of light work).

Substantial evidence supports the ALJ's determination that the impairments evidenced in Anderson's medical records did not meet the requirements of the listed impairments in Appendix 1. (R. 13.)

---

[30/]    The record, however, indicates that Anderson's blood pressure fluctuated at times during Anderson's claimed disability period.  See R. 180 (128/80); R. 182 (160/100); R. 188 (130/80); R. 192 (120/80); R. 194 (120/80); R. 196 (120/80); R. 198 (120/80); R. 200 (130/90); R. 202 (130/100); R. 204 (140/100, at which point Dr. Photangtham prescribed Hyzaar); R. 206 (140/100); R. 208 (130/90); R. 210 (132/100, 118/80); R. 121 (140/90); R. 123 (140/90).

**D.**    <u>Anderson Had the Ability to Perform His Past Work or Other Light Work</u>

The fourth prong of the five part analysis is whether Anderson had the residual functional capacity to perform his past relevant work, that is, his work as a clothing designer. The ALJ found that Anderson had the residual functional capacity to perform light work. (<u>See</u> page 12 above.) "Light work" is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b). Anderson's past relevant work as a fashion designer qualifies as "light work"; Anderson's jobs as a designer involved some desk work, standing and walking for about six hours per day, and regularly lifting rolls of material that weigh between ten and twenty pounds. (<u>See</u> page 3 above.)

Anderson testified that he was able to walk for ten to fifteen blocks at a time, do his own cooking, shopping, and cleaning, and that he is active almost every day of the week. (<u>See</u> page 3 above.) Anderson noted that he swims or walks every day so as to "keep [his] mind and body as active as possible." (R. 97.) Anderson had no trouble using public transportation by himself. (<u>See</u> page 4 above.) As he candidly admitted, his main obstacle to finding work was his lack of the necessary computer skills. (<u>See</u> page 3 above.) The ALJ found that Anderson could "stand and walk for six hours out of an eight hour workday, . . . sit for six hours out of an eight hour workday . . . , and lift and carry 20 pounds at a time occasionally up to ten pounds at a time frequently." (<u>See</u> page 12 above.)

Substantial medical evidence supports the ALJ's conclusion (R. 14-15) that Anderson was capable of resuming his former employment as a fashion designer.

Because Anderson did not meet his burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Anderson was not disabled as of June 2004 within the meaning of the Social Security Act is supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 8) should be GRANTED.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 755, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Swain (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86

(1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d

Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>,

892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988);

<u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72, 6(a), 6(e).

Dated:     New York, New York
           March 12, 2008

                              Respectfully submitted,

                              _____
                              **Andrew J. Peck**
                              United States Magistrate Judge

Copies to:    Ernest Anderson (Regular & Certified Mail)
              John E. Gura, Jr., Esq.
              Judge Laura Taylor Swain

H:\OPIN\ANDERSON